# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-4125

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of North Dakota. |
| Duane Philip Bercier, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: June 12, 2007
Filed: November 1, 2007

_____

Before LOKEN, Chief Judge, ARNOLD and COLLOTON, Circuit Judges.

_____

LOKEN, Chief Judge.

A jury convicted Duane Bercier of aggravated sexual abuse and abusive sexual contact in Indian country in violation of 18 U.S.C. §§ 2241(a)(1), 2244(a)(1), and 1153. The victim was his sister's eighteen-year-old foster daughter, Cheryl Blue. Bercier appeals the conviction, raising numerous issues. We reject the contention that the evidence was insufficient to convict but conclude that the district court abused its discretion in admitting hearsay testimony by an examining physician recounting in considerable detail what the victim said in a hospital interview about the alleged assault, including the assailant's identity, and portions of a hospital record containing the same hearsay. Because these errors were not harmless, we remand for a new trial.

We leave open the question whether the two counts are multiplicitous because that issue was not properly raised in the district court.

## I. Sufficiency of the Evidence

In March 2005, Bercier was living in the home of his sister, Joyce Poitra, with Blue and other members of Poitra's family. Blue testified that Bercier and a female companion returned home at approximately 12:30 a.m. on March 13 and entered Bercier's bedroom, previously Blue's bedroom, where Blue was smoking and playing a video game. Bercier and Blue played video games and began watching a movie. Bercier's companion, who died before the trial, fell asleep.

Blue testified that Bercier expressed romantic feelings and, when she stood up to leave, grabbed her arm, sat her on the bed, and began kissing her and rubbing her arm. Blue again stood up to leave. Bercier pulled her down on his lap and asked her to have sexual intercourse. Blue declined. Bercier grabbed her hand and started rubbing it on top of his penis. Blue protested and again attempted to leave. Bercier pushed her back on to the bed, put his hand and then his head up her shirt, and touched and kissed her breasts. Blue tried to push him away and told him she did not like what he was doing. Bercier put his hands and head between her legs, pushed her panties to the side, put his fingers in her vagina, and engaged in oral sex. Blue tried to press her legs together, but Bercier held them apart. When Blue started crying, Bercier told her to go to bed, and she left. Bercier admitted in a stipulation that he performed oral sex on Blue and that his saliva was found on her panties and sanitary napkin. He testified that the entire incident was consensual.

The indictment charged Bercier with the use of force, an element of both offenses, aggravated sexual abuse and abusive sexual contact. See 18 U.S.C. §§ 2241(a)(1) and 2244(a)(1). On appeal, Bercier argues there was insufficient evidence that he used force. We will reverse only if no reasonable juror could have

-2-

found Bercier guilty, reviewing the evidence in the light most favorable to the government and accepting all reasonable inferences supporting the verdict. United States v. Crow, 148 F.3d 1048, 1050 (8th Cir. 1998) (standard of review).

Bercier argues that he never threatened Blue, did not injure her, did not use a weapon, and let her leave the room when she did not respond the way he hoped. "At the very worst," Bercier argues, "Blue described a clumsy effort . . . at seduction." However, the element of force is satisfied by showing "the use of such physical force as is sufficient to overcome, restrain, or injure a person; or the use of a threat of harm sufficient to coerce or compel submission by the victim." United States v. Allery, 139 F.3d 609, 611 (8th Cir.), cert. denied, 524 U.S. 962 (1998), quoting H.R. Rep. No. 99-594, at 14 n.54a (1986), reprinted in 1986 U.S.C.C.A.N. 6186, 6194 n.54a. Blue testified that Bercier pushed her back on the bed and would not let her push him away when he put his head and hand up her shirt and began touching and kissing her breasts. Then, Bercier forcibly held her legs apart while he performed oral sex. If credited by the jury, this was sufficient evidence of the use of force. The district court did not err in denying Bercier's motion for acquittal on both counts.

## II. Hearsay Issues

At trial, Blue testified that, after leaving Bercier's bedroom, she called boyfriend A. J. Newcomer and told him she had been assaulted. Newcomer drove to the Poitra home and took Blue to a local hospital. An emergency room nurse, Phylomine Houle, examined Blue, and a physician, Dr. Angela Erdrich, interviewed Blue and treated her for sexual assault. After Blue testified, the next three witnesses were Newcomer, Nurse Houle, and Dr. Erdrich. Each testified over defense objections to what Blue told them in the morning hours about the encounter. Bercier argues that the district court abused its discretion in admitting this hearsay testimony. He further challenges the admission of the hospital's Ambulatory Encounter Report containing Dr. Erdrich's detailed notes of what Blue said during the interview.

The government argues there was no error in admitting this testimony because the "primary justification" for excluding hearsay is the lack of opportunity to cross-examine an absent declarant, and Blue testified at trial. The district court apparently agreed, because its explanation for overruling Bercier's objection was that "the statements probably qualify as hearsay, but they're the same statements which the jury has already heard, so I see really no problem with admitting and letting the continuity of testimony flow." The problem with this reasoning is that the Supreme Court *rejected* the same contention in <u>Tome v. United States</u>, 513 U.S. 150, 163-65 (1995).

Blue's hearsay statements were consistent with her trial testimony and were offered as substantive evidence of Bercier's guilt, not for the limited purpose of rehabilitating Blue's credibility at trial. <u>Compare</u> <u>United States v. Andrade</u>, 788 F.2d 521, 532-33 (8th Cir.), <u>cert. denied</u>, 479 U.S. 963 (1986), <u>with</u> <u>United States v. Lozada-Rivera</u>, 177 F.3d 98, 103-04 (1st Cir. 1999). Rule 801(d)(1)(B) of the Federal Rules of Evidence provides that a trial witness's prior consistent out-of-court statement is *not* hearsay if it is "offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." In <u>Tome</u>, resolving a conflict in the circuits, the Court held that, to be admissible as non-hearsay under Rule 801(d)(1)(B), a prior consistent statement must have been made "*before* the charged recent fabrication.*" 513 U.S. at 167 (emphasis added). Here, Bercier's defense at trial was that Blue fabricated her story of non-consensual sexual assault immediately after leaving his bedroom. As the alleged fabrication occurred before her out-of-court statements to Newcomer, Nurse Houle, and Dr. Erdrich, Rule 801(d)(1)(B) does not apply. <u>See</u> <u>United States v. Beaulieu</u>, 194 F.3d 918, 920 (8th Cir. 1999). In these circumstances, each statement was admissible only if it fell within one or more of the hearsay exceptions in Rule 803. <u>See</u> <u>United States v. Kenyon</u>, 397 F.3d 1071, 1081-82 (8th Cir. 2005).

For these reasons, the district court's rulings, as the court explained them, reflected an incorrect interpretation of the Federal Rules of Evidence as construed in

Tome.  However, "we are not bound by the grounds on which the district court admitted the evidence, as it is a well-settled principle that we may affirm a district court's judgment on any basis supported by the record." United States v. Levine, 477 F.3d 596, 601 (8th Cir.), cert. denied, 127 S. Ct. 3023 (2007) (quotation omitted).  The government argues on appeal that the hearsay testimony of each of the three witnesses fell within one of Rule 803's hearsay exceptions.

**A.**  We have little difficulty upholding on this basis the district court's rulings with respect to the first two witnesses, boyfriend Newcomer and Nurse Houle. Newcomer testified that Blue told him "the basics of what happened" over the telephone, but "she was crying too much," so he went to her house.  When he arrived at the Poitra home, some fifteen to twenty minutes after Blue left Bercier's bedroom, she was shaking and crying uncontrollably, had trouble breathing, and could not stand. Blue told him she had been sexually molested by her uncle.  Newcomer comforted her, told her "to go inside and get some clothes," and took her to the hospital.  The government argues that, to the extent this testimony included out-of-court statements by Blue, it was properly admitted under the excited utterance exception to the hearsay rule.  See Fed. R. Evid. 803(2).  We agree.

Rule 803(2) excepts an out-of-court statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  Blue's statements to Newcomer were made less than thirty minutes after the incident, a lapse of time that does not make the statements inadmissible for this reason.  See United States v. Phelps, 168 F.3d 1048, 1055 (8th Cir. 1999).  As described by Newcomer, Blue's "condition at the time was such that the statement was spontaneous, excited or impulsive rather than the product of reflection and deliberation." United States v. Iron Shell, 633 F.2d 77, 86 (8th Cir. 1980), cert. denied, 450 U.S. 1001 (1981).  Therefore, the district court did not abuse its discretion by admitting Newcomer's testimony.

Nurse Houle testified that, when Blue arrived at the emergency room, Houle tested her vital signs, which included a highly elevated pulse rate, made an initial assessment, and reported this information on the Ambulatory Encounter Report. Houle was then asked what Blue presented as her major complaint. The district court overruled defense counsel's objection. Although the court should have required the government to lay additional foundation, Houle's answer -- "she [Blue] stated that she had been assaulted" -- was clearly admissible under Rule 803(4), the hearsay exception for statements made for the purpose of obtaining medical diagnosis or treatment. So long as the identity of the perpetrator is not disclosed, "a patient's statement describing how an injury occurred is pertinent to a physician's diagnosis and treatment." United States v. Gabe, 237 F.3d 954, 957-58 (8th Cir. 2001). Thus, the district court did not abuse its discretion by admitting Blue's statement to a medical examiner, Nurse Houle.

**B.** That brings us to the nub of the appeal, the hearsay testimony of Dr. Erdrich, who testified immediately after Newcomer and Nurse Houle. Dr. Erdrich first testified that she had received sexual assault response team training "through the Department of Justice." Consistent with that training, when Blue "came that morning for a sexual assault exam" within 72 hours of the alleged assault, Dr. Erdrich "ask[ed] the police to bring us a rape kit." Dr. Erdrich then explained the steps involved in using the rape kit -- gathering and bagging Blue's undergarments, collecting a DNA sample from her cheek, putting head and pubic hair samples in an envelope, collecting relevant debris in small bags, swabbing the vaginal area, interviewing the patient, and conducting a physical exam. In Blue's case, Dr. Erdrich testified, the physical exam revealed "a small area of abrasion on her labia and the vulva."

This preliminary testimony established that Dr. Erdrich was trained to perform, and did perform, not only diagnosis and treatment of patient Blue, but also evidence-gathering tasks relevant to any criminal prosecution that might ensue. The patient interview was an important part of Dr. Erdrich's forensic assignment, as well as her

role as an emergency room treating physician.  After testifying that she conducted a "long interview" of Blue, Dr. Erdrich was asked:

Q.  Do you recall what Cheryl Blue told you concerning the incident that caused her to be in the emergency room?

[DEFENSE COUNSEL]:  Your Honor, I'm going to renew my objection.

\* \* \* \* \*

THE COURT:  All right.  And I will overrule it.  You may answer.

THE WITNESS:  Yes, I do recall, and I've been able to review my notes from that night, and may I state it or --

Q.  ([THE PROSECUTOR] CONTINUING)  Yes, you may.  What -- what was the complaint that Cheryl came into the emergency room for?

A.  She came in appearing extremely emotionally traumatized and stated that her Uncle Manny [Bercier] had -- had sexually assaulted her, and she said that he had gone -- gone down on her, and she described in detail that night, what had happened.

Q.  And what did she tell you happened?

A.  She said that he had come in and out of the house that night and had come back around midnight, and she was playing Nintendo and he came into a room where there's a TV and beckoned her to sit by him, and that he started kissing her ear and her breasts and doing gross stuff and that she -- that he started to have oral sex with her.  And she pushed him away and said no, and that he didn't seem to understand that she was saying no.  And she kept pushing him away, eventually was able to get him to stop, that she was terrified because he had -- she had known him to be violent in the past.

[DEFENSE COUNSEL]: Excuse me, Your Honor. I'm going to object again on the basis that that has nothing to do with treatment or diagnosis.

THE COURT: Understand. That last statement doesn't add anything to our picture. Then I will order that last statement stricken.

Following Dr. Erdrich's testimony, the district court admitted, over defense counsel's objection, the Ambulatory Encounter Record containing Dr. Erdrich's detailed notes of what Blue said during the patient interview. The government argues on appeal that both Dr. Erdrich's testimony and the Ambulatory Encounter Record were admissible under Rule 803(4). We disagree.

Statements made by a patient seeking medical diagnosis or treatment are excluded from the hearsay rule because "a statement made in the course of procuring medical services, where the declarant knows that a false statement may cause mis-diagnosis or mistreatment, carries special guarantees of credibility." White v. Illinois, 502 U.S. 346, 356 (1992). Therefore, for a statement to be admissible under Rule 803(4), "the declarant's motive in making the statement must be consistent with the purposes of promoting treatment; and . . . the content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis." United States v. Renville, 779 F.2d 430, 436 (8th Cir. 1985).

Statements to a medical professional concerning the cause of an injury -- "I was assaulted" -- are usually admissible under Rule 803(4). But statements identifying the assailant are "seldom, if ever," sufficiently related to diagnosis or treatment to be admissible. Iron Shell, 633 F.2d at 84. Such statements may be admissible if the identity of the abuser is relevant to treating the victim's emotional or psychological injuries. But the government must demonstrate that (i) the physician made clear to the victim that inquiry into the abuser's identity was essential to diagnosis and treatment, and (ii) "the victim manifest[ed] such an understanding." Renville, 779 F.2d at 438,

-8-

followed in <u>Gabe</u>, 237 F.3d at 958, and in <u>United States v. Turning Bear</u>, 357 F.3d 730, 738 (8th Cir. 2004).

Here, the government did not offer Dr. Erdrich's testimony and hospital notes under Rule 803(4), so there was no foundation establishing that Dr. Erdrich told Blue that the lengthy interview inquiring into the identity of the assailant and the details of what happened were essential to her diagnosis and treatment. Nor was there evidence Blue manifested such an understanding. Moreover, while some statements by Blue to Dr. Erdrich were clearly relevant to diagnosis and treatment,[1] Dr. Erdrich's testimony and, to an even greater extent, her notes in the Ambulatory Encounter Record related statements having no evident relationship to diagnosis and treatment, strongly suggesting that the purposes of the interview went far beyond Dr. Erdrich's role as a treating physician. The presence of law enforcement officers at the hospital questioning Blue near the time of Dr. Erdrich's interview reinforce that inference. We discern no relationship between diagnosis and treatment and Blue's detailed description of the encounter to Dr. Erdrich. The physician's testimony relating that hearsay simply bolstered Blue's earlier account of the same events. Finally, the government offered no evidence establishing that the identity of Blue's assailant was pertinent to Dr. Erdrich's diagnosis and treatment. For these reasons, much of Dr. Erdrich's testimony and notes relating what Blue said in the interview were not admissible under Rule 803(4). As this evidence did not fall within another hearsay exception, the district court abused its discretion by admitting it. Fed. R. Evid. 802.

A non-constitutional error admitting hearsay testimony "that does not affect substantial rights must be disregarded." Fed. R. Crim. P. 52(a); <u>see</u> <u>United States v. Chapman</u>, 345 F.3d 630, 635 (8th Cir. 2003), <u>cert. denied</u>, 541 U.S. 955 (2004). An error is harmless under Rule 52(a) "if the reviewing court, after viewing the entire

---

[1]For example, Dr. Erdrich conducted a vaginal examination because Blue said she had been digitally penetrated, but did not administer a pregnancy test or treat Blue for sexually transmitted diseases because Blue said there was no intercourse.

record, determines that no substantial rights of the defendant were affected, and that the error did not influence or had only a very slight influence on the verdict." United States v. Cortez, 935 F.2d 135, 140 (8th Cir. 1991), cert. denied, 502 U.S. 1062 (1992) (quotation omitted). Evidence erroneously admitted is frequently found to be harmless if it was cumulative, that is, if "other evidence to the same effect was properly before the jury." United States v. White, 11 F.3d 1446, 1451 (8th Cir. 1993) (quotation omitted). Prior consistent statements of a trial witness are necessarily cumulative -- they reiterate the witness's trial testimony. Thus, we have held in more than one case that admitting prior consistent statements that "merely bolstered a witness's credibility by repeating testimony already in evidence" was harmless error. But we have recognized "[t]here could be circumstances, however, where that extra helping of evidence can be so prejudicial as to warrant a new trial." United States v. Ramos-Caraballo, 375 F.3d 797, 802-03 (8th Cir. 2004) (quotation omitted); see White, 11 F.3d at 1451. We conclude this is such a case.

The improperly admitted testimony by Dr. Erdrich is strikingly similar to the hearsay testimony of a physician's assistant that we concluded was *not* harmless error in Kenyon, 397 F.3d at 1082. As in Kenyon, the testimony of Blue, the victim, buttressed by her prior consistent out-of-court statements to Newcomer and Houle, was the sole basis for conviction; her testimony that the sexual acts were non-consensual "was uncorroborated by physical evidence or witnesses to the alleged abuse." As in Kenyon, Bercier presented testimony that, if believed, contradicted Blue's account of the events leading up to the alleged assault, and he directly challenged Blue's testimony that the sexual acts were non-consensual. And as in Kenyon, the hearsay recorded in the Ambulatory Encounter Record augmented Blue's trial testimony by relating her prejudicial accusations that Bercier had a history of violence and substance abuse, after the district court struck Dr. Erdrich's testimony that Blue had accused Bercier of violence "in the past."

The determinative factors for us in this case are, first, that the prosecution turned on the credibility of Blue and Bercier, and second, that the hearsay testimony and notes of Dr. Erdrich, a neutral health professional, confirmed Blue's description of the alleged sexual assault and events leading up to the assault, and added Blue's prejudicial accusations that Bercier had a history of violence and substance abuse. Much of this hearsay had no medical significance and was contradicted by Bercier. Boyfriend Newcomer and Nurse Houle previously testified that, immediately after the incident, Blue said she was sexually assaulted and named the assailant. The only purpose in having Dr. Erdrich testify to the non-medical information gathered during her interview, when she was acting as a *de facto* criminal investigator as well as a health professional, was to bolster Blue's trial testimony. In a case that turned entirely on the credibility of Blue, this tipped the scales unfairly. We cannot conclude that such an error was harmless. Bercier is entitled to a new trial.

### III. A Double Jeopardy Issue

Depending on the circumstances, aggravated sexual contact may be a lesser-included offense of aggravated sexual abuse. See United States v. No Neck, 472 F.3d 1048, 1054 (8th Cir. 2007). Bercier argues that his convictions for both offenses violated the Fifth Amendment's Double Jeopardy Clause, invoking the familiar principle that a defendant may not be convicted of both a greater and a lesser included offense. "[T]he lesser offense . . . requires no proof beyond that which is required for conviction of the greater . . . . The greater offense is therefore by definition the 'same' for purposes of double jeopardy as any lesser offense included in it." Brown v. Ohio, 432 U.S. 161, 168 (1977). Bercier did not raise this issue in the district court, so our review is for plain error. United States v. Honarvar, 477 F.3d 999, 1001 (8th Cir. 2007).

The problem with this contention is that, while abusive sexual contact may be a lesser included offense when a single criminal event is involved, aggravated sexual

abuse is a different crime, and each may be violated during a series of distinct criminal acts. Here, Blue's testimony, which we must assume the jury credited for these purposes, established that Bercier engaged in conduct that violated each statute during the alleged assault. Touching and kissing Blue's breast to gratify his sexual desire was "sexual contact" that constituted abusive sexual contact when done by force or threat. See 18 U.S.C. §§ 2244(a)(1), 2246(3). Digital and oral sex were "sexual acts" that constituted aggravated sexual abuse when done by force or threat. See 18 U.S.C. §§ 2241(a)(1), 2246(2)(B) and (C). The real question in these circumstances is one that Bercier does not address -- were the two counts multiplicitous. In other words, how many sex crimes does a defendant commit when he inflicts a series of distinct sexual offenses on the victim during a single incident? See generally Gore v. United States, 357 U.S. 386 (1958).

We addressed this question in United States v. Chipps, 410 F.3d 438, 447-49 (8th Cir. 2005), which involved the crime of simple assault. The question turned, we explained, on "whether Congress intended the facts underlying each count to make up a separate unit of prosecution." Id. at 447. To answer that question, we looked to whether Congress intended to punish assault "as a course of conduct, such that the first bit of assaultive conduct . . . is of a piece with the second bit . . . or whether Congress sought to punish separately individual acts within an assaultive episode." Id. at 448. Our decision turned on an analysis of the statutory language, the statutory scheme, and any relevant legislative history. After concluding that simple assault was a course of conduct offense, we then applied the "impulse test" which "treat[s] as one offense all violations that arise from that singleness of thought, purpose or action, which may be deemed a single 'impulse.'" Id. at 449, quoting United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 224 (1952).

In this case, the district court instructed the jury, without objection, that Bercier was charged with two offenses and that it must separately consider the evidence pertaining to each offense. A number of cases have held that state court convictions

-12-

for multiple sex offenses did not violate the Double Jeopardy Clause if, under state law, "a defendant may receive multiple punishments for numerous sex offenses rapidly committed with the sole aim of sexual gratification." Rhoden v. Rowland, 10 F.3d 1457, 1462 (9th Cir. 1993); see Holdren v. Legursky, 16 F.3d 57, 62 (4th Cir.), cert. denied, 513 U.S. 831 (1994); State v. James, 643 S.E.2d 34, 37-38 (N.C. Ct. App. 2007); State v. Cleveland, 614 N.W.2d 543, 550-51 (Wis. Ct. App. 2000). We have not found a case thoroughly addressing this question in the context of the federal sexual assault offenses here at issue. Cf. United States v. Torres, 937 F.2d 1469, 1471, 1475 (9th Cir. 1991); Pinson v. Morris, 830 F.2d 896, 897 (8th Cir. 1987), cert. denied, 488 U.S. 829 (1988). As there was sufficient evidence that Bercier committed two distinct sex offenses during the assault, there was no plain error. However, we leave the question open for further development on remand.

## V. Prosecutorial Misconduct Issues

Bercier argues that the district court abused its discretion by denying his request for a mistrial following two improper comments during the prosecutor's rebuttal closing argument. We have examined the brief comments in question. When defense counsel objected to the first, the court responded, "Leave that one," which was surely an adequate caution. We doubt the second comment was error, and it certainly was not error warranting grant of defense counsel's tardy request for a mistrial. As the comments were made during rebuttal, neither is likely to recur. We decline to consider them further.

The judgment of the district court is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

_____